1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION

3  SOCIETY FOR HUMAN RESOURCE   )  Case 1:16-cv-00596
   MANAGEMENT,                  )
4                               )
                 Plaintiff,     )
5                               )
        v.                      )  Alexandria, Virginia
6                               )  June 24, 2016
   NORTHERN CALIFORNIA HUMAN    )  11:35 a.m.
7  RESOURCES COUNCIL,           )
                                )
8                Defendant.     )
   ─────────────────────────────)  Pages 1 - 51
9

10      TRANSCRIPT OF PLAINTIFF'S MOTION FOR PRELIMINARY

11                      INJUNCTION

12        BEFORE THE HONORABLE ANTHONY J. TRENGA

13          UNITED STATES DISTRICT COURT JUDGE

14
   APPEARANCES:
15
   FOR THE PLAINTIFF:
16
        ALVIN DUNN, ESQUIRE, *PRO HAC VICE*
17      SARA E. STINSON, ESQUIRE, *PRO HAC VICE*
        MICHAEL A. WARLEY, ESQUIRE
18      PILLSBURY, WINTHROP, SHAW & PITTMAN, LLP
        1200 Seventeenth Street, N.W.
19      Washington, D.C.  20036-3006
        (202) 663-8000
20
   FOR THE DEFENDANT:
21
        MICHAEL E. BARNSBACK, ESQUIRE
22      M. RICHARD COEL, ESQUIRE
        LECLAIRRYAN, PC
23      2318 Mill Road, Suite 1100
        Alexandria, Virginia  22314
24      (703) 647-5931

25    COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1          THE CLERK:  Civil Action 1:16-cv-596, *Society*

2   *for Human Resource Management v. Northern California*

3   *Human Resources Council.*

4          Will counsel please identify themselves for

5   the record.

6          MR. DUNN:  Your Honor, Alvin Dunn of

7   Pillsbury Winthrop Shaw Pittman representing Plaintiff'

8   Society for Human Resource Management.  At counsel

9   table is Sara Stinson and Michael Warley, who is our

10  local counsel.  Here in the court is Henry Jackson, who

11  is the SHRM president and CEO, who would be prepared to

12  testify if helpful to the Court.

13         THE COURT:  All right.  Welcome.

14         MR. BARNSBACK:  Good morning, Your Honor.

15  Mike Barnsback for the defendant, Northern California

16  Human Resources Council.  We refer to it as NCHRA.  I

17  have with me Richard Coel with my office.  We're with

18  LeClairRyan.  Also, I have present Greg Morton, who is

19  the CEO of NCHRA.

20         THE COURT:  Okay.  Welcome to all of you.

21         We're here for SHRM's motion for preliminary

22  injunction.  I've reviewed all the papers and would be

23  pleased to hear further from counsel.

24         Counsel.

25         MR. DUNN:  Thank you, Your Honor.

1          Again, if helpful to the Court, Mr. Jackson
2    is prepared to testify today.
3          THE COURT:  Let me just frame this for you as
4    I've looked at this.  What it really boils down to,
5    doesn't it, is a request that this Court enforce
6    restrictive covenants which are disfavored, that are
7    not explicitly stated in any of the contractual
8    documents?  Isn't that a fair characterization?
9          MR. DUNN:  Your Honor, the documents do not
10   say that NCHRA cannot operate expressly, do not say
11   they cannot operate in Washington state.  They don't
12   that they expressly.
13         THE COURT:  There doesn't seem to be anything
14   that really even gets close to that; is there?
15         MR. DUNN:  Your Honor, we think there is.
16   There's extensive use of the words "territory" and
17   "service area."
18         THE COURT:  Right.  But even when people use
19   those, you can have exclusive territories.  You can
20   have nonexclusive territories.  You want to infer that
21   these are exclusive service areas even if those terms
22   are used as a formal allocation of entitlements.
23         MR. DUNN:  Your Honor, that's because of the
24   chapter structure, which is the understanding -- we
25   believe it's the understanding that NCHRA has had up to

4

1 this day until this point.  We've put in even the

2 declaration from one of their former executive

3 directors that she always understood that they were

4 limited in their activities to their territory.  It's

5 just part of the entire chapter structure.

6          And everything other -- I mean, we've got

7 eight of them for you, but I can represent to the

8 Court:  I think we could have 500 of them for you.

9 Every other chapter state society, state counsel in

10 this country that's an affiliate of SHRM has the same

11 exact understanding that the arrangement is -- it's a

12 chapter structure.  It's a nationwide chapter

13 structure, that each one is limited to its territory,

14 and you can't have one from Kansas going to Illinois to

15 open up and say, Here we are to present programs and

16 attract members from Illinois.  It's all part of the --

17 it is the course of performance, but it's been

18 consistent in every single chapter in SHRM.  We believe

19 NCHRA up to this point have agreed to that.

20          THE COURT:  But that notion is such a central

21 feature of the system that you claim is in place.

22 Don't you find it surprising that it's not anywhere

23 explicitly stated as such?

24          MR. DUNN:  Your Honor, I think the parties

25 probably never thought it was really necessary.  The

1  very, very early documents, which are in the record,

2  from NCHRA at its formation at the time in seeking

3  affiliation with SHRM say these are our --

4          THE COURT:  I understand, and I've read the

5  explanation for it.  It makes complete sense.  It would

6  make sense that various chapters would operate within

7  their own particular geographical sphere, and it

8  promotes a lot of values.

9          It's a little bit like operating under a

10  theory of mutual assured destruction.  Everybody is

11  sort of deciding that it makes sense for everybody to

12  simply operate in their own particular area, because if

13  they didn't, there was going to be retaliation that

14  would adversely affect them.  But that doesn't

15  necessarily mean that everybody agreed to contractually

16  limit themselves to doing that if they decided to

17  proceed otherwise; does it?

18          MR. DUNN:  Well, we believe that they did

19  agree.  The words "territory" and "service area" that

20  they set forth in many, many, many places -- they set

21  forth all of their ZIP codes where they're -- for

22  example, where they operate as a delivery partner for

23  their course materials.  It's the same ZIP code range,

24  you know, as where they're operating within their

25  territory as NCHRA.

1          They send out these e-mail blasts from here
2  in Virginia to help recruit new members.  Those are
3  always -- they go through and click through on the Web,
4  and they say, This is our ZIP code range.  It's always
5  been within Northern California.  There's never been a
6  suggestion that they have the right to go into
7  Washington state to have in-person activities, recruit
8  new members if they want, offer their services.
9          That has always been until now the agreement
10  of -- and they've abided by that agreement until now.
11  Now they say that they are short of revenue.  Because
12  of some reason, they have to go out to Washington state
13  and they have to go down to Arizona to put on their
14  programs.
15          It's unfortunately going to -- if it's not
16  stopped, it's going to wreck havoc on this chapter
17  structure.  All the other chapters are up in arms
18  because they understand -- they've agreed to limit
19  themselves to their territories.  That's always been
20  their understanding.  This is why we're here.  It's
21  because we really believe we have to draw the line.
22  They've just gone way out of bounds.
23          THE COURT:  Well, the issue is whether it's a
24  breach of contract.
25          MR. DUNN:  Yes, Your Honor.

1           THE COURT:  I'll hear further from you on

2    that.

3           MR. DUNN:  Okay.  Well, you've put your

4    finger on it.  The agreements, the written documents do

5    not say NCHRA agrees that it will not operate and put

6    an in-person event outside of its territory in those

7    words.  They don't say that.  But there are many, many

8    places -- and we've documented it all over the place --

9    where they talk about their geographic areas.  They

10   talk about their territory.  It's in their oldest

11   bylaws which we approved.  They set forth, Here is our

12   geographic area.  That's in their bylaws.  It's in the

13   chapter charter.  It talks about their territory, their

14   service area.  The plain meaning is you operate in your

15   service area.

16           They have always said, Our mission is to

17   better serve the profession in Northern California in

18   all of their materials.  If they had said in Northern

19   California and in Washington state, we would have

20   jumped all over them, as we have now, when they're

21   going outside.

22           The materials show they've got a defined ZIP

23   code range in a number of places, and that's where we

24   assist them to recruit members.

25           THE COURT:  In those instances where there's

1    reference to ZIP codes and service areas, there are

2    explanations for why that's in there for reasons other

3    than imposing an exclusivity on territories.  The

4    society itself doesn't recognize the territories as

5    exclusive for the purpose of restricting its own rights

6    to place additional chapters in those territories, for

7    example.

8              The licensing agreement for the delivery

9    partnership agreement appears to contemplate that an

10   institution can use the SHRM logo materials worldwide.

11             MR. DUNN:  Your Honor, the licensing

12   agreement -- I'm assuming you're referring to

13   Exhibit M, the distribution agreement.

14             THE COURT:  Yes.

15             MR. DUNN:  Just to be clear, that's a

16   slightly different activity.

17             THE COURT:  That's for the accreditation.

18             MR. DUNN:  It's for course materials for

19   their courses, and that does make very clear that --

20   just so you'll know, there's only three chapters.

21   Because NCHRA is one of the larger chapters, there's

22   only three chapters in the whole SHRM chapter system

23   that actually participate in getting those course

24   materials out.

25             It's really a supplemental effort because

1    mostly the course materials, as you might imagine, are

2    distributed through educational institutions.  So

3    there's about 250 colleges and universities that offer

4    these courses and also have an agreement.  So that

5    really is somewhat different.  It's really telling this

6    chapter and two others who have agreed to do it that

7    you're helping us further distribute these materials;

8    therefore, we need extra help in the Northern

9    California area.

10           THE COURT:  So these are distributed by mail

11   and not in programs; is that right?

12           MR. DUNN:  The materials, I think -- yeah, I

13   think they're distributed by mail or through the

14   Internet from a distributor in Minnesota.

15           THE COURT:  Separate and apart from any

16   particular program that's offered?

17           MR. DUNN:  Well, it's in connection with

18   offering three courses.  They need materials.  So they

19   come through.  But the way it's set up -- SHRM, in

20   connection with offering its courses for

21   recertification, they need -- they don't have that set

22   up in a way that there's only one provider in Northern

23   California.

24           THE COURT:  So is it SHRM's position that a

25   chapter who is authorized to distribute these materials

1  can conduct programs outside of its geographical area?

2         MR. DUNN:  No.  No.  No.  It's a limited

3  distribution right to just distribute these materials

4  within the defined ZIP code.  It is a -- this is a

5  separate function from actually recruiting members and

6  having programs, which is the main function of

7  chapters, which is to say we're affiliated with

8  national.  So that's why that's not defined as

9  exclusive in that area.

10         But all of the other -- in just the course of

11  performance over the last 50-plus years has been that

12  every single chapter understands.  Again, I argue NCHRA

13  understands.  They came to SHRM and said, We want to

14  change our name.  We want to change our name to HR

15  West.

16         They needed SHRM's permission.  SHRM said,

17  No.  That would confuse people to make them think that

18  you are entitled to go beyond your Northern California

19  territory.

20         That passed, and then the next thing we know

21  is they're -- and we said, You can use it for

22  conferences within your Northern California territory.

23  Just stay within your territory.

24         The next thing we know, they're opening up

25  and wanting to have events -- or planning events in

1  Washington state, Arizona, and Nevada, which, again,

2  breaches the agreement.  It's a long-standing,

3  well-understood agreement practice that they've got to

4  keep their events within --

5           THE COURT:  The charter was last negotiated

6  when?

7           MR. DUNN:  Around 2005-2006, Your Honor.

8           THE COURT:  Are the actual negotiators still

9  around that negotiated that charter?

10          MR. DUNN:  I believe they are.  We've got --

11 again, we've got a declaration from the NCHRA executive

12 director who was at least around in 2004-2005

13 concerning this --

14          THE COURT:  She wasn't involved in the actual

15 negotiations of the charter?

16          MR. DUNN:  Of the charter?  I would have to c

17 check, Your Honor.

18          THE COURT:  It all comes down to contractual

19 intent and how you determine that.

20          MR. DUNN:  Yes, Your Honor.  We believe

21 there's ample evidence on which to determine that we've

22 got a restriction here that is clear and enforceable.

23 It's clearly understood by SHRM, we argue by NCHRA up

24 to this point, and clearly by every other chapter in

25 the country.  They all have the same charters.

12

```
 1            THE COURT:  Well, I've looked at the
 2   declarations.  They don't quite say that they
 3   understood they were contractually restricted.  What
 4   they say is that they always understood that everybody
 5   would stay in their own particular area to operate or
 6   provide programs, which is a little different.
 7            MR. DUNN:  Okay.  Well, I think that's their
 8   understanding and intent.
 9            THE COURT:  Right.  I understand.
10            MR. DUNN:  So, Your Honor, I think you've
11   absolutely put your finger on it.  We think that
12   there's -- given that they've gone outside the
13   territory and they're operating in a manner
14   inconsistent with the purposes of SHRM, that the use of
15   the trademarks is a violation.
16            The harm is completely irreparable.  I mean,
17   the confusion that it could cause and the chaos that it
18   could cause by just kind of allowing everybody to open
19   up and larger chapters go into smaller chapters' areas
20   and start offering programs and saying, Here we are.
21            THE COURT:  You're certainly in a position to
22   amend these charters at least as to everybody but
23   NCHRA.  It sounds like it would be an easy thing to do.
24            MR. DUNN:  Your Honor, it would be doable,
25   but it wouldn't solve our current issue.
```

1            THE COURT:  Certainly, it wouldn't solve this

2    problem, but it would certainly make explicit what you

3    claim everybody understood was the case.  I guess

4    everybody but this chapter.

5            MR. DUNN:  You're right, Your Honor.  Up to

6    this point, SHRM and the chapters just haven't believed

7    that that was necessary.  This is all through the

8    50-plus years of this chapter, national chapter setup.

9    There's never been the issue that we face with one

10   chapter going two states above its territory to jump in

11   and offer a program.

12           THE COURT:  You don't see any antitrust

13   issues with construing the contractual arrangements in

14   the fashion that the society is arguing?

15           MR. DUNN:  No, because it's just a single

16   brand.  I would think that any national organization

17   with a single brand would have absolutely no problem.

18   We're not restricting generally HR professionals from

19   gathering together and offering events that further

20   education.

21           THE COURT:  Do you see difficulties under any

22   particular state law?  I know that you contend this is

23   governed by Virginia law.  For example, under

24   California law, do you see any particular problems with

25   that kind of construction?

1         MR. DUNN:  Not at all because it's just a

2    single brand.  We're not doing anything to restrict.

3    As the papers point out, there are other opportunities,

4    other organizations that say, for instance, might offer

5    certification courses for HR professionals.  There

6    could be -- any group or organization could get

7    together and offer a training course for HR

8    professionals.  We are not restricting any of that.  We

9    are not trying to agree with anyone.

10        We set up a nationwide chapter structure that

11   says, You're going to stay within your territory when

12   you are promoting yourself as a SHRM affiliate.  The

13   same thing -- I wouldn't think there's any problem with

14   the American Diabetes Association saying to the

15   Mississippi and Alabama chapters:  Stay within your

16   territories if you want to -- if one wants to go to the

17   other territory, you better form a joint event.  You

18   shouldn't be competing with each other and operating in

19   the other territory.  It just creates confusion, and it

20   impinges on good will.

21        Because we want each of our organizations --

22   and these are all volunteer organizations.  We want

23   each of them to feel that we're there, you know,

24   working toward -- for the benefit of SHRM, working

25   toward the benefit of ourselves to get new members to

1  promote the good work of SHRM to promote our own good

2  work without having somebody from a territory two

3  states away come in and start to offer programs in

4  competition with us.

5          I don't think there's any competition problem

6  with that at all.  It's a single brand, again, not

7  restricting any other organizations who aren't SHRM

8  affiliates from coming into that territory.

9          THE COURT:  I read your explanation, but tell

10  me a little bit more of what you make of those

11  pronouncements a few years ago from the California

12  state council.  Tell me precisely what the relationship

13  is between the council and society.

14          MR. DUNN:  Yeah.  So each state has a number

15  of chapters.  California has many chapters, and then

16  states have what they call a state council, which is

17  just a voluntary separate organization that sits over

18  the main --

19          THE COURT:  Who serves on those?  Chapter

20  members?  Members from chapters?

21          MR. DUNN:  An executive from the chapter

22  would be on that state council.

23          THE COURT:  So they would come from the

24  chapters?

25          MR. DUNN:  They would come from the chapters

1  to coordinate the efforts and then be a go-between

2  between the chapters and SHRM.

3          Look, from what we've been able to tell, this

4  was just an isolated incident, and you have a

5  declaration from the NCHRA executive at the time that

6  this was just a scheduling issue and it got worked out

7  very quickly at the council and chapter level.  It

8  never went up to -- SHRM didn't have to step in.  It's

9  the only -- we've looked and looked and looked and

10 looked.  Nothing, nothing, nothing has happened since.

11         THE COURT:  I guess my reaction is that if

12 this understanding was so uniform and universal, it

13 would be surprising within any context to see members

14 from chapters adopting an explanation that basically is

15 inconsistent with positions the society is taking.

16         MR. DUNN:  Well, that statement was not

17 authorized by SHRM.

18         THE COURT:  I understand, but it was issued

19 by a group of people who come from chapters that you

20 say everybody understands --

21         MR. DUNN:  I think they just put it in there.

22 I think they worked this thing out very quickly.  Yeah.

23 If SHRM had seen it and focused on it, yeah, maybe they

24 should have like corrected the record right there.

25 This is 12 years ago, and we have limited -- we found

1    the one person, you know, who was, again, running NCHRA

2    at the time, and you have her explanation.

3              THE COURT:  I understand.

4              All right.  Anything else?

5              MR. DUNN:  No, Your Honor.  Thank you.

6              THE COURT:  All right.  Let me hear from

7    NCHRA.

8              MR. BARNSBACK:  Your Honor, just from a

9    general perspective, SHRM is claiming that a one day --

10   let's focus on the July conference in Seattle.  They're

11   claim to be able to get this extraordinary relief

12   injunction is that a one-day conference held in one

13   city is going to completely destroy their chapter

14   structure.  They're trying to stop that July 15

15   conference from going forward on the premise that if we

16   do it, it's going destroy the entire chapter structure.

17   They claim they've got 285,000 members worldwide.

18             In our brief, we said we had 79, I believe,

19   registrants for that conference in July.  It's now -- I

20   heard it's up to 125.  So they're saying by 125 people

21   attending a one-day conference in Seattle -- which, by

22   the way, is the same day that SHRM has set their own

23   conference up to try to protect, as they say in their

24   affidavit from Mr. Jackson, protect their local

25   chapters -- that this is somehow going to destroy the

1  chapter concept that, as has been fleshed out, doesn't

2  exist.

3          There may be an idea of a chapter concept.

4  Certain chapters may have an understanding that they

5  are supposed to do things a certain way, but there's

6  certainly no writing.  This is the first I've heard

7  that everyone has the same chapter agreement.  So now

8  we're dealing with 571 chapters that have the same

9  agreement that NCHRA has that does not have a

10 restriction on their territory.

11         In fact, it very expressly states, The

12 purpose of this agreement is provide protection and

13 guidance regarding each party's rights and

14 responsibilities.

15         Critical to the timing of the negotiation and

16 the entry of this agreement, Your Honor, this happened

17 two years after that California issue where you see the

18 letters by the state council saying SHRM doesn't have a

19 policy that prohibits people from acting outside.  So

20 in a very near term after that first incident where

21 NCHRA allegedly was acting outside of its territory, a

22 chapter agreement comes its way that doesn't address,

23 that, Your Honor.  It says, We're here to address the

24 rights and responsibilities.  There's clearly no

25 express restriction on our activities outside the

1   so-called territory.

2           Paragraph 3 -- again, if this holds for every

3   chapter, it's significant -- NCHRA shall have autonomy

4   with regard to all phases of its operation subject to

5   its governing instruments.  Our bylaws -- which the

6   Court has -- do not restrict our activities to Northern

7   California, to California or anywhere in the

8   Continental United States.  We can conduct business

9   anywhere we choose.

10          There are references to territory and service

11  area in the charter agreement, but those references are

12  specific.  Paragraph 11 talks about territory in the

13  specific context of the membership list.  It's done in

14  this context.  They quote, SHRM is the exclusive owner

15  of the names, mailing addresses, e-mail addresses, and

16  telephone numbers of those individuals working or

17  living within NCHRA's territory who are members of SHRM

18  but not members of NCHRA.

19          So territory is discussed in terms of who

20  owns the respective membership list.  SHRM has the

21  exclusive ownership of those SHRM members that are

22  within NCHRA's territory.  NCHRA has the membership --

23  the ownership of its members in that area.

24          So the only discussion of territory deals

25  with use of membership lists and names.  There are no

20

1    allegations that NCHRA's activities in setting up this
2    conference in Seattle, in Las Vegas, and Phoenix, that
3    we violated those terms by using any of those
4    membership lists.

5            Now the only other reference in the charter
6    deals with service area.  These create actually
7    obligations upon SHRM.  In paragraph 13, SHRM agrees
8    that if another chapter wants to affiliate with SHRM
9    within NCHRA's service area, it will notify us first.
10   It doesn't say that service area is exclusive.  It
11   doesn't say it will prevent that chapter from joining.
12   It says they'll notify us, encourage them to become our
13   affiliate, but that's the extent of SHRM's obligation
14   with our service area.

15           The only other reference to service area is
16   in paragraph 14.  It says, SHRM will work on a
17   comprehensive strategy with NCHRA regarding programming
18   in our service area.

19           No context in this chapter agreement does
20   territory or service area restrict our activities.

21           Further, there's no definition of the
22   territory.  We don't know what that territory is.  We
23   don't know what the service area is.  So to the extent
24   that's ambiguous, perhaps parol evidence can come in to
25   define it.  Perhaps prior use can come in, but that's

1   only in the context of our use of the mailing lists and

2   SHRM's obligation to advise us if another chapter wants

3   to try to affiliate in whatever our service area may

4   be.  It is not used, Your Honor, to try to create a new

5   obligation to restrict our activities within an

6   undefined service territory.

7          There's only one document before the Court

8   that lists ZIP code, that may be used to somehow

9   delineate something with regard to NCHRA.  That's in

10  the 2012 letter agreement, that licensing agreement for

11  the SHRM educational products.  That is found in

12  paragraph 5.  It's Section B, paragraph 5, and that is

13  Exhibit M to SHRM's initial brief.  I think that's

14  Exhibits M to Mr. Jackson's declaration.

15         It follows under a section that creates

16  obligations for SHRM.  So the ZIP codes are creating

17  some obligation on SHRM, and it simply says, quote,

18  SHRM agrees to attempt to advise the institution before

19  entering into an agreement with any other educational

20  institution within the general service area.  An

21  institution's market is defined by the following ZIP

22  code.

23         So the only reference to ZIP codes places an

24  obligation on SHRM to, again, advise us if someone else

25  is going to be engaged under this licensing agreement.

1        Significant, which has not been mentioned,

2   the 2014 addendum to this agreement which is attached

3   eliminates that obligation.  So in the addendum --

4   which I think if you look at the docket number for the

5   exhibit -- so it's Document 512, page 12 of 14,

6   paragraph 9 specifically amends that in 2012 agreement

7   to remove that ZIP code obligation on SHRM at

8   paragraph 5.

9        So as early as 2014, SHRM itself has said,

10  Oh, no, we're not abiding by any ZIP code applications

11  with regard to NCHRA.

12       So given the context that the only document

13  before this Court that defines any sort of area by ZIP

14  code placed an obligation of SHRM that now is not even

15  an obligation -- it's been removed by the amendment --

16  there's clearly no contractual basis to impose any

17  restriction on NCHRA's activities.

18       Going to the harm issue, Your Honor, the harm

19  is completely speculative.  The harm that Mr. Jackson

20  talks about is what if another mega chapter, one that's

21  not identified, decides it's going to go outside of

22  this unwritten chapter structure?  What would that do

23  to us?  That's not the type of harm that is sufficient

24  to establish the extraordinary relief that's necessary

25  to get a preliminary injunction.  It's purely

1  speculative.

2       We have an absolute right to do our business,

3  to put on educational programs wherever we want.  We're

4  putting one on in Seattle.  In fact, SHRM has put on a

5  counter on the same day to try to reestablish the local

6  chapter's brand.  It clearly has that as an available

7  remedy.

8       The Court has already look at one potential

9  remedy.  Maybe, if this chapter structure is to

10  integral to the existence of SHRM which has been around

11  for 50 years, maybe these chapters should be amended to

12  require a geographic restriction on the chapters

13  ability to do work.  Maybe, though, that geographic

14  restriction is not in place because it would violate

15  various state and federal laws prohibiting these type

16  of horizontal monopolies.

17       It's a perceived violation to have this type

18  of horizontal restriction across the board, and that's

19  exactly what we're talking about when we have one

20  national entity coordinating the efforts of 571

21  chapters for them to all agree, We're carving out this

22  section, and we're only going to offer these HR

23  services as an autonomous entity within this section.

24  All of the chapter agreements, presumably, acknowledge

25  that all of the 571 chapters are autonomous and can

1  engage in their activities however they choose.

2          That looks, smells, feels like it's a

3  horizontal restriction on competition.  That's exactly

4  what they're trying to do, is prevent NCHRA that's been

5  able to put on successful programs, to put those

6  programs on in competition in the free market in a

7  permissible way just as SHRM is putting out its

8  competing one against us in Seattle.

9          There's nothing here that says we can't do

10 it.  There's nothing before the Court that indicates

11 that SHRM is going to suffer any harm, let alone

12 irreparable harm, by this July 15 conference.  That's

13 the first one that's coming forward.

14          We've raised the jurisdictional issue.

15 Again, I think -- I did that a threshold matter.  I

16 also did that to preserve it because we're very early.

17 We received our request to waive service on June 3 --

18 sent it back on June 3.  So we still have 60 days from

19 May 31 to file our initial Rule 12 motions.  I don't

20 intend on waiting that long.  I want to get those

21 before the Court.  I want the Court to hear them.

22          Those initial motions, as I mentioned in my

23 brief, would be a motion to dismiss for lack of

24 personal jurisdiction and also a motion to transfer.

25 Because SHRM is asking this Court, a Virginia court, to

1  restrict the activities of a California entity to

2  California.  If you look at the standards -- again,

3  those motions will be before the Court soon -- this

4  strikes me as something that's best decided on the

5  merits -- again, I understand we're at a preliminary

6  stage.

7          But it's either a California court or a court

8  sitting in Seattle that's going to look at this issue

9  and determine whether there's any actual harm and, more

10 importantly, whether there's any basis on these

11 contracts or a basis that doesn't violate public policy

12 of those areas to restrict NCHRA's activities, Your

13 Honor.

14          THE COURT:  Thank you.

15          MR. BARNSBACK:  Thank you.

16          THE COURT:  Counsel, I'll give you the last

17 word on this.

18          MR. DUNN:  Real quick, Your Honor.  Look, the

19 harm would be imminent, and I think that Mr. Jackson --

20 and you can hear from him if you want.

21          THE COURT:  Well, I've read his detailed

22 affidavit.

23          MR. DUNN:  What?

24          THE COURT:  I've read his detailed affidavit.

25          MR. DUNN:  Okay.  Autonomy.  He points to

1    they're autonomous.  That's there because each entity

2    is a separate corporation, a separate entity.  That

3    doesn't mean that they have autonomy and could, you

4    know, abuse our trademark and use it somehow other than

5    how the logo is put out or whatever.  It still has to

6    abide by all the rules and restrictions on the chapter.

7    That doesn't mean they don't have to do that.

8              On where is the territory, the ZIP codes are

9    not just in this distribution agreement.  As

10   Mr. Jackson's affidavit makes clear, these e-mail

11   blasts also -- there's the form in there where the

12   NCHRA chapter whenever it wants to send out these blast

13   e-mails has to say, I agree, and it agrees to its ZIP

14   code range and where those e-mails are going.  That is

15   within their Northern California territory.  It's not

16   in Washington state, nowhere near.

17             On personal jurisdiction, Your Honor, I think

18   we've established there's been a lot of context in

19   Virginia, including in-person visits, which

20   distinguishes it from all of their cases.  There's been

21   a number of in-person visits by NCHRA personnel to

22   Virginia, lots of contacts doing business here with

23   SHRM, which then sends money to them, sends out e-mails

24   for them, etc.

25             The transfer question is different, and it's

27

1  not before the Court.  That's a balance, of course, of

2  the convenience of the parties and the witnesses.  We

3  haven't really gotten to that discussion, yet.

4          So, Your Honor, I would urge you to grant the

5  preliminary injunction.

6          THE COURT:  All right.  Thank you.  I'm going

7  to take a brief recess and then come out with my

8  decision.

9      (Recess from 12:08 p.m. until 12:34 p.m.)

10         THE COURT:  I've reviewed the motion and the

11 opposition together with the points made in argument.

12         Let me first say that I think it's

13 unfortunate that two long-standing and highly regarded

14 organizations find themselves at this impasse after

15 what has clearly been a very long-standing, mutually

16 beneficial, and profitable relationship.  I would urge

17 the parties to continue their discussions to discuss a

18 way to resolve their issues.

19         This is the kind of case that can develop in

20 very unexpected ways and have twists and turns that can

21 surprise even the most confident litigants.  So I would

22 urge the parties, if they're not continuing to talk, to

23 renew their discussions.  If the Court's auspices

24 either party thinks would be useful to them in trying

25 to work this out, please don't hesitate to contact the

1  Court.  We have very experienced magistrate judges who

2  have dealt with issues like this, and I think you would

3  find them helpful if there's a good faith interest in

4  trying to resolve these issues.

5          In any event, the case is before the Court on

6  a motion for preliminary injunction which was filed

7  together with the complaint on May 31, 2016, and

8  noticed for a hearing on June 8, 2016.

9          The Court's rulings, as reflected today,

10  necessarily are based on a limited record.  The legal

11  observations and conclusions that are reflected in the

12  Court's statements today are for the purposes only of

13  this preliminary injunction hearing and are not

14  intended to be law of the case or for any purpose other

15  than ruling on the motion for preliminary injunction.

16          Briefly summarized, SHRM alleges that NCHRA,

17  which SHRM describes as one of the oldest and largest

18  chapters, violated the terms and conditions of its

19  charter by sponsoring events outside the geographical

20  area of Northern California.  In that regard, SHRM

21  alleges that its 571 affiliated chapters have agreed,

22  consistent with long-standing practice, that each

23  chapter will hold events and solicit membership

24  exclusively within its prescribed territory and

25  otherwise market only to HR professionals located

1  within that territory.

2          SHRM defines those territories by specific

3  ZIP code range, which in the case of NCHRA is 94000 to

4  95599; although, a different range appears in the

5  delivery partnership agreement before the 2014

6  addendum.

7          In any event, SHRM alleges that NCHRA is

8  using its registered trademarks without SHRM's consent

9  in connection with its planned events outside of

10 Northern California in a manner that is likely to cause

11 confusion among members of the human resources

12 industry, especially members located in Northern

13 California, Seattle, Phoenix, and Las Vegas.

14         The motion seeks an order prohibiting NCHRA

15 from proceeding with the following events:  A Seattle

16 conference on July 15, 2016; a Las Vegas conference on

17 October 21, 2016; and a Phoenix conference on

18 December 2, 2016; as well as any other planned events

19 or marketing efforts outside of Northern California.

20         Additionally, the motion seeks to restrain

21 any further use of SHRM trademarks in connection with

22 these events, as well as the use of the HR West brand

23 on any NCHRA activities outside of their designated

24 territory.

25         It is well settled that a preliminary

1    injunction is an extraordinary equitable remedy which

2    allows a party to obtain certain relief at the

3    beginning of a case that would ordinarily only be

4    appropriate upon a final adjudication in favor of the

5    moving party.  For that reason, the standards for

6    issuance of a preliminary injunction are high, strict,

7    and demanding.

8         In that regard, in order to obtain a

9    preliminary injunction, the moving party in this case,

10   SHRM, must clearly establish, first, it's likely to

11   succeed on the merits of its claim; secondly, it is

12   likely to suffer irreparable harm in the absence of

13   preliminary relief; third, the balance of hardships tip

14   in its favor; and fourth, that the injunction is in the

15   public interest.

16        With respect to the first element, the

17   likelihood of success on the merits, the Court has

18   considered both the elements of SHRM's claims and also

19   whether this Court has personal jurisdiction over NCHRA

20   since the ability to exercise personal jurisdiction is

21   an essential aspect of SHRM's ability to succeed on the

22   merits.

23        With respect to personal jurisdiction, SHRM

24   alleges that this Court has jurisdiction over NCHRA

25   because that chapter has repeatedly transacted business

1    in Virginia pursuant to its affiliation agreement with

2    SHRM and has performed a substantial part of its

3    obligations under the affiliation agreement with SHRM

4    in Virginia.

5         SHRM alleges that, also, venue is proper

6    presumably under Section 1391(b)(2) which authorizes

7    venue in a judicial district where a substantial part

8    of the events or omissions giving rise to the claim

9    occurred or a substantial part of property that is the

10   subject of the action is situated.

11        In its reply, SHRM relies on the forum

12   selection clause in the delivery partnership agreement

13   between SHRM and NCHRA, which sets forth the terms and

14   responsibilities of the parties for the use of the SHRM

15   educational products, which was signed on October 25,

16   2011, and November 11, 2011, respectively.

17        Here the evidence in the record is that NCHRA

18   is a California nonprofit mutual benefit corporation

19   whose offices are located in San Francisco.  NCHRA has

20   been an affiliate of SHRM since 1962 and is one of

21   SHRM's largest chapters.  It is also undisputed that

22   NCHRA does not have an office in Virginia, is not

23   registered to do business in Virginia, does not

24   maintain a registered agent in Virginia, and does not

25   have employees who perform services in Virginia.

1          It also appears it does not conduct meetings,
2  networking functions, subject matter conferences, or
3  seminars in Virginia.  On the other hand, NCHRA appears
4  to have at least one dues paying member here at a
5  Virginia address who became a member in June 2005,
6  lists her job title as director of human resources for
7  an organization listed in California, who has not
8  participated in any NCHRA events and has not listed
9  NCHRA as her primary membership, meaning that another
10  SHRM chapter is listed as her primary chapter and
11  receives credit and money for her membership.
12          There's also evidence that during NCHRA's
13  more than 50-year affiliation with SHRM, these entities
14  have interacted in a variety of ways, including NCHRA's
15  submission of annual year-end reports to SHRM's
16  Virginia headquarters, which details NCHRA's
17  activities, finances, and memberships, which SHRM uses
18  to confirm the chapter's good standing allowing NCHRA
19  to continue holding itself out as a SHRM affiliate for
20  the next calendar year.  This procedure also triggers a
21  yearly financial payment to NCHRA, which the chapter
22  uses to fund its continued operations.
23          Through its affiliation, NCHRA also has
24  access to and continuously used SHRM's membership
25  database, which SHRM maintains at its Virginia

1    headquarters.  It also appears that NCHRA officers and

2    representatives have made personal visits to Virginia

3    over the years, including for the purpose of attending

4    what is referred to as a product delivery partners

5    summit in 2014 negotiating an addendum to the parties'

6    2012 delivery partnership agreement and also to attend

7    SHRM's annual volunteer leaders summit.

8           Nevertheless, whatever frequency and nature

9    of these activities, they appear all to have occurred

10   within the context of NCHRA's status as an affiliate of

11   SHRM and its receipt of the services and benefits that

12   that membership provides, as opposed to an entity who

13   has independently chosen to conduct business in

14   Virginia outside of that membership status.

15          Moreover, it is not apparent that these

16   activities are in the nature of a joint enterprise

17   between SHRM and NCHRA, but rather are typical

18   activities for a member of a trade association where

19   that member is simply taking advantage of a benefit

20   provided by that organization.

21          In any event, the Court cannot conclude at

22   this point, on the basis of the present record, that

23   NCHRA's status as a SHRM affiliate together with the

24   benefits that have flowed to NCHRA as a result of that

25   affiliation constitute such continuous and systematic

1   contacts with Virginia as to subject it to general

2   jurisdiction within the Commonwealth of Virginia.

3            The evidence is sufficient, however, for the

4   Court to conclude at this point that there are

5   constitutionally sufficient minimum contacts with this

6   forum for the purpose of this Court's exercising

7   whatever specific jurisdiction may exist under

8   Virginia's long-arm statute, as well as a sufficient

9   connection with this forum for the purpose of

10  exercising personal jurisdiction under an applicable

11  forum selection clause contractually created by the two

12  parties.

13           With respect to that forum selection clause,

14  under Section E(4) of the delivery partnership

15  agreement, the parties agree that any disputes

16  concerning disagreements shall be subject to the

17  exclusive jurisdiction of the federal and state courts

18  in Virginia, with the parties submitting to the

19  exclusive jurisdiction of the state and federal courts

20  in Virginia over any disputes concerning that

21  agreement, and further agree that they are subject to

22  jurisdiction in Virginia in any such dispute.

23           Here SHRM alleges that this agreement

24  governs, at least in part, the current dispute over

25  NCHRA's use of SHRM's educational products and the

1   related use of SHRM's logos and trademarks in

2   connection with NCHRA providing educational programs in

3   Seattle, Phoenix, and Las Vegas.  SHRM has sued for

4   trademark infringement, and one of the key aspects of

5   the case is NCHRA's use of SHRM's trademarks in

6   connection with its offering of SHRM professional

7   development credits for attendance at the Seattle,

8   Phoenix, and Las Vegas events.

9           That dispute, therefore, falls within the

10  scope of the delivery partnership agreement, which

11  governs the use of SHRM educational products and

12  specifically references the use of materials in

13  connection with the HR institute certification

14  referenced in Section A(5).

15          SHRM's breach of contract claim also arises

16  out of the charter between the two organizations, which

17  does not contain a forum selection clause, but in a

18  dispute appears at this point to arise out of the same

19  common nucleus of facts and is inextricably related to

20  NCHRA's trademark use.

21          For that reason, the Court concludes at this

22  preliminary stage and for the purposes of this motion

23  that SHRM has made a sufficient showing that it will

24  succeed in establishing this Court's personal

25  jurisdiction over NCHRA under the forum selection

1 clause.  For that reason, it's not necessary for the
2 Court to consider further at this time personal
3 jurisdiction based on any specific aspect of Virginia's
4 long-arm statute.
5         Let me now speak to the first element
6 necessary to satisfy preliminary injunction, and that
7 is whether SHRM has clearly established the likelihood
8 of success on the merits of its claims.  The Court has
9 considered whether SHRM has, in fact, made a sufficient
10 showing in that regard.  Those claims, including
11 Count 1, claim that by conducting the Seattle, Las
12 Vegas, and Phoenix events, NCHRA will violate its
13 affiliation agreement with SHRM; and in Count 2, that
14 by using the SHRM trademarks in connection with those
15 events, NCHRA has exceeded the authorized use of those
16 trademarks; therefore, its conduct constitutes
17 trademark infringement.
18         As the recitation of those claims make clear,
19 both are premised on the contention that NCHRA has
20 violated the terms and conditions of contractual
21 agreements, including specifically that since NCHRA
22 became a SHRM chapter in 1962, NCHRA has agreed to
23 limit its activities to its Northern California
24 territory.
25         In support of this claim, SHRM relies on the

1    fact that the terms "territory" and "service area"

2    appear in Sections 11, 13, and 14 of the charter:

3    NCHRA's name, which has a geographical aspect to it,

4    specifically Northern California; the ZIP codes listed

5    in Section B(5) of the delivery partnership agreement;

6    NCHRA's bylaws in which it's stated that NCHRA's

7    purpose is to be, quote, the voice of the profession in

8    human resource management issues within the geography

9    serviced; NCHRA's documents referencing its service

10   area; and NCHRA's description of itself on its website,

11   which states that NCHRA currently serves more than

12   20,000 people, quote, throughout its 12 regions of

13   Northern California.

14            SHRM also relies heavily on the parties'

15   course of dealing and course of performance, as well as

16   what it refers to as the understandings of the parties

17   themselves, and also the understandings of other SHRM

18   chapters as evidenced in statements from six other SHRM

19   chapters stating that the reference to territory as

20   used in their charters refers to an agreed-upon

21   geographic service area.

22            SHRM also relies on the same agreements and

23   documents to support its claim that NCHRA is infringing

24   on SHRM's trademarks by using those trademarks outside

25   of its designated service area.  In that regard, SHRM

1  contends that the delivery partnership agreement does

2  not permit NCHRA to offer SHRM professional development

3  credits for events that SHRM has not approved and that

4  NCHRA knows are directly against SHRM's interest.

5  Rather, those agreements, according to SHRM, only

6  permit NCHRA to use SHRM's name and logo in connection

7  with particular educational courses and do not cover

8  conferences hosted by NCHRA under the guise of HR West.

9          Similarly, SHRM argues that its charter

10 expressly prohibits NCHRA from using SHRM's trademarks

11 in connection with products or programs that are

12 contrary to SHRM's purposes.

13         In assessing the merits of these claims, the

14 Court has reviewed the parties' charter, bylaws,

15 delivery partnership agreement pertaining to the use of

16 SHRM educational materials together with its 2014

17 addendum, as well as the other materials submitted in

18 support of SHRM's motion, including the various

19 declarations submitted by the other chapters.

20         First, the Court observes that there is no

21 written agreement that either explicitly assigns NCHRA

22 to a specific geographical territory or any agreement

23 that NCHRA is *de facto* or recognized service area or

24 territory shall be exclusive as to NCHRA or that the

25 chapter is prohibited from conducting activities in

1    another geographical location.

2           Territories can be exclusive or not

3    exclusive, and there is no mention anywhere of the kind

4    of restrictive covenant that SHRM relies on for the

5    purposes of seeking its injunction.  In that regard,

6    paragraph 9 of the charter sets forth in detail the

7    terms and conditions of the license to use the SHRM

8    name, acronym, and logo, and there are none of the

9    geographical or other restrictions that SHRM claims as

10   the basis for its injunction.

11          Paragraph 3 of the charter expressly confirms

12   that NCHRA shall have autonomy with respect to all

13   phases of its operations subject to its governing

14   instruments.  The Court sees nothing in NCHRA's

15   governing documents that explicitly restricts its

16   activities to a particular geographic location or

17   territory.  Likewise, there's nothing in the charter

18   that restricts NCHRA's license to use SHRM trademarks

19   or logos to a particular geographical location.

20          Second, there also appears to be, in fact,

21   provisions in these agreements that strike the Court as

22   either inconsistent with or somewhat at odds with the

23   notion that restrictive covenants can be imposed on

24   NCHRA by inference or implication.  For example,

25   Section A(8) of the delivery partnership agreement --

1  which I think the Court referenced in the colloquy with

2  counsel -- appears to contemplate in some fashion

3  NCHRA's ability to use SHRM educational materials in

4  locations outside the United States.

5          Likewise, Section B(5), which SHRM relies on

6  but which was eliminated in the addendum and which

7  lists SHRM's obligations, states, quote, No protected

8  geographical areas will be guaranteed to any

9  institution under this agreement.  If SHRM determines

10 that the needs of all potential students cannot be met

11 by a single institution in a given area, additional

12 institutions may be sought.

13         The charter itself expressly confirms the

14 right of SHRM to create other charters within the same

15 territory or geographical location of another

16 affiliate.  In that regard, the only actual mention of

17 NCHRA's territory or service area in the charter is in

18 paragraphs 11, 13, and 14.  Each of those references,

19 however, are for a specific purpose that does not

20 necessarily presume a restriction of the type SHRM

21 seeks to enforce.

22         For example, paragraph 13 entitled Groups

23 Wishing to Affiliate in NCHRA's Territory provides, in

24 pertinent part, that, quote, SHRM agrees that it will

25 notify NCHRA of any groups wishing to affiliate as a

1    chapter in NCHRA's service area.

2            The terms "territory" and "service area" are

3    nowhere defined.

4            It also goes on to say that while SHRM will

5    involve NCHRA officers during the consideration of

6    another chapter within that service area and will

7    encourage interested groups to affiliate with NCHRA,

8    SHRM nevertheless will consider the affiliation request

9    regardless of whether NCHRA and the interested group

10   are able to come to a mutual agreement.

11           In other words, SHRM reserves its right to

12   place more than one chapter in the same service area,

13   which means that from SHRM's perspective, NCHRA's

14   territory or service area is not a service area or

15   territory exclusive to NCHRA.  Assuming this provision

16   appears in all charters, SHRM has the right to

17   authorize a chapter to conduct events outside of that

18   chapter's territory and service area and in another

19   chapter's area and territory.

20           While it's certainly possible that there

21   could be a contractual arrangement that might exist

22   where an affiliate is restricted from operating outside

23   a particular area without any protection from other

24   chapters being placed in or operating in its area, it's

25   difficult to reasonably imply that kind of contractual

1  imbalance.

2          While this provision speaks to an explicit

3  reservation of SHRM's rights, one would reasonably

4  expect the kind of restrictive covenants that SHRM

5  implies should be imposed on NCHRA would be explicitly

6  stated somewhere, particularly given the

7  anticompetitive nature of the restriction that SHRM

8  would impose on NCHRA.

9          The Court has also considered SHRM's other

10 arguments and finds that they do not sufficiently

11 establish at this point that SHRM is likely to succeed

12 on the merits.  In that regard, SHRM argues that its

13 obligations under Section B(5) to attempt to advise

14 NCHRA before entering into a delivery partnership

15 agreement with any other educational institution within

16 NCHRA's defined market by ZIP codes 940 to 960

17 necessarily means that NCHRA cannot operate outside of

18 those ZIP codes.  That provision has been eliminated in

19 paragraph 9 of the addendum.

20          In any event, the contention that a

21 restrictive covenant can be imposed implies a

22 restrictive covenant of the type SHRM argues appears to

23 be based on *non sequitur*.  The provision that appears

24 in Section B sets forth SHRM's agreements and

25 obligations, not NCHRA's.  The reference to a market

1  defined by ZIP codes for the purpose of SHRM's

2  obligations says little, if anything, about whether

3  NCHRA has agreed to restrict its activities to that

4  service area.

5        SHRM also argues that restrictions on NCHRA's

6  right to operate outside of a certain geographical

7  location are necessarily imposed because of the

8  requirement that NCHRA's licensed use of the SHRM

9  trademarks must be consistent with SHRM's purposes and

10 not in derogation of its reputation or the validity of

11 those marks.

12       In that regard, SHRM relies heavily on that

13 part of paragraph 9 of the charter which provides, in

14 pertinent part that, quote, NCHRA shall not use the

15 licensed marks in any manner that is inconsistent with

16 the purposes of SHRM or in any manner which would

17 damage the reputation of SHRM or adversely affect the

18 validity of SHRM's rights and the licensed mark.

19       This paragraph also states that NCHRA shall

20 not use any of the licensed marks to indicate or imply

21 endorsement or sponsorship by SHRM without the

22 expressed written consent of SHRM and that all actions

23 taken by NCHRA in connection with the licensed marks

24 and all products, programs, and other services offered

25 by NCHRA under the licensed marks must be consistent

1  with the purposes of SHRM in compliance with the SHRM

2  bylaws as amended from time to time.

3          As I mentioned earlier, significantly, there

4  is no language that can be included within that

5  paragraph that can be reasonably read to say that NCHRA

6  is prohibited from using the SHRM trademarks outside of

7  its service area mentioned in other documents.

8          SHRM's purposes by which NCHRA's conduct is

9  to be measured is not explicitly stated or referenced

10 in the charter.  The Court understands from the

11 declarations how SHRM has framed its purposes and how

12 NCHRA's conduct is inconsistent with those purposes,

13 but none of those purposes appear either defined or

14 referenced necessarily in any of the documents.

15         There is one explicit reference to SHRM's

16 purposes, which is in its bylaws marked as Exhibit I to

17 defendant's opposition.  In that regard, Article I,

18 Section 3 of those bylaws, which is entitled Purposes,

19 states that the purposes of SHRM shall be to promote

20 the use of sound and ethical human resource management

21 practices in the profession; and to be recognized as a

22 world leader in human resource management; to provide

23 high-quality, dynamic and responsive programs and

24 services to customers with an interest in human

25 resource management; to be the voice of the profession

1  on human resource management issues; to facilitate the

2  development and guide the direction of the human

3  resource profession; and to establish, monitor, and

4  update standards for the profession.

5          Nothing in that statement suggests that

6  SHRM's purpose is necessarily to regulate or restrict

7  the competitive behavior of its members or affiliates

8  or to promote competition among human resource

9  organizations.

10         SHRM has also failed to produce sufficient

11 evidence for the Court to conclude at this time that

12 it's likely that SHRM can establish that NCHRA's use of

13 its logos and trademarks or conducting its proposed

14 events is inconsistent with any of the stated purposes

15 in its bylaws that I've mentioned.  Likewise, there's

16 insufficient evidence for the Court to conclude at this

17 point that SHRM is likely to establish that NCHRA's use

18 of its logos will either damage SHRM's reputation or

19 affect the validity of those trademarks.

20         For those reasons, the Court concludes that

21 SHRM has not presented evidence sufficient at this time

22 to establish clearly a likelihood of success on its

23 contentions that the various documents and agreements

24 entered into between the parties do not permit NCHRA to

25 operate outside of any specific territory or to offer

1    SHRM professional development credits for events that

2    SHRM has informed NCHRA it has not approved.

3           Similarly, the Court has to conclude at this

4    point that the evidence is insufficient to establish a

5    likelihood of success on its contention that the

6    various agreements only permit NCHRA to use SHRM's name

7    and logo in connection with specific particular

8    educational courses and do not cover conferences hosted

9    by NCHRA under the guise of HR West.

10          SHRM contends that NCHRA's use of the

11   trademarks will cause confusion among its chapters

12   concerning its role.  The Court has considered that.

13   Again, the Court can't conclude that contention has

14   been clearly established.

15          The issue really reduces to whether NCHRA

16   operating outside of what would be regarded as its

17   service area will confuse members into thinking that

18   SHRM has affirmatively authorized those events to

19   compete with the local chapters.  Under the charter

20   agreement, NCHRA has the right to use the SHRM logo

21   subject to the conditions previously mentioned in

22   paragraph 9 of the charter.

23          It also has the right to state that it's a

24   SHRM affiliate, as well as the right to offer SHRM

25   professional development credits.  The evidence is

47

1  insufficient to clearly establish that NCHRA's use of

2  the SHRM name would cause confusion as to who was

3  sponsoring the event.

4        Again, the Court has to conclude at this

5  point that the evidence is insufficient to establish a

6  likelihood that SHRM will prevail on the claim that

7  there's trademark infringement based on the likelihood

8  of confusion as to the sponsorship or involvement of

9  SHRM.  Whatever the local chapters may believe, they

10 have presumably the same chapter documents -- and some

11 of them apparently have the same delivery partnership

12 agreements as NCHRA -- and can review those documents

13 for themselves and determine whether NCHRA was required

14 to obtain affirmative authorization for SHRM.

15 Likewise, SHRM has the ability to communicate with its

16 own membership with respect to any clarification it

17 believes is needed.

18        With respect to its lack of involvement in

19 those events that NCHRA has planned, it also appears

20 that there's no contention that were NCHRA to engage in

21 precisely the same conduct that it's engaging in or

22 proposes to engage in in Northern California, that SHRM

23 would think there was confusion as to what role SHRM

24 played with respect to NCHRA programs.

25        Finally, the Court has considered the

48

1    declarations submitted by the other chapters which

2    states their understandings.  First, I think it's

3    important to state that the dispute here is between

4    these parties, and the issue is one of contractual

5    intent as between these particular parties.  For that

6    reason, the understandings of other chapters with

7    respect to their own contractual undertakings has

8    limited relevance.

9           Second, those individuals, essentially, said

10   nothing more than that over the years, they had decided

11   not to operate beyond what was regarded as their

12   service areas and assumed that other chapters had made

13   the same decision and that, as far as they knew, no

14   chapter other than NCHRA had ever claimed the right to

15   operate outside what was regarded as its service area.

16          No one in those declarations, however, has

17   explicitly stated that the parties who entered into

18   those agreements at the time that those agreements were

19   entered into intended to contractually restrict their

20   legal rights to operate outside any particular

21   geographical area.  Although, again, even if they had,

22   there's a substantial question what relevance that

23   would have as to the contract between these two

24   particular parties.

25          The Court understands that the declarations

1  were presented as evidence of a course of dealing

2  within the human resources community and SHRM chapters

3  evidence of which may or may not be relevant or

4  admissible with respect to a construction

5  interpretation of the parties' legal obligations and

6  rights.   The Court does not rule on that issue at this

7  time, nor does the Court rule on what effect any

8  additional evidence may have on any of the observations

9  and conclusions the Court has made for the purposes of

10  this preliminary injunction motion.

11          In any event, at this point, SHRM has not

12  presented evidence sufficient to clearly establish that

13  there's a likelihood of success on the claim that NCHRA

14  is contractually restricted to a specific service area

15  or location or that its proposed events constitute a

16  breach of the charter.  At this point, it appears that

17  the injunction that SHRM is requesting would,

18  essentially, require this Court to rewrite the parties'

19  charter.

20          So for those reasons, the Court concludes

21  SHRM has failed to establish a likelihood of success on

22  the merits of its breach of contract claim and its

23  trademark infringement claim.

24          With respect to the second element,

25  likelihood of irreparable harm in denying injunctive

1  relief, again, the Court must conclude at this point

2  that the record does not clearly establish that SHRM

3  will experience irreparable harm.

4           First, irreparable harm must be assessed

5  within the context of irreparable harm to a cognizable

6  legal right.  Here, as discussed earlier, SHRM has not

7  adequately established for the purposes of preliminary

8  injunction that it has the right to impose the kind of

9  restrictive covenants that is a fundamental premise of

10  its position.  Moreover, it's not at all clear that

11  NCHRA's activities will inflict the kind of damage that

12  is alleged, which appears less than concrete and

13  imminent.

14           Similarly, the Court must conclude that SHRM

15  has not clearly established that the balance of

16  hardships fall in its favor or that the public interest

17  is in favor of an injunction, particularly given the

18  highly anticompetitive impact such an injunction would

19  have and the substantial legal issues that would exist

20  were such restrictions imposed.

21           So for all of these reasons, the Court will

22  deny SHRM's motion, and the motion for preliminary

23  injunction is denied.  The Court will issue an order.

24           Is there anything further at this point?

25           MR. BARNSBACK:  No, Your Honor.

1          MR. DUNN:  No, Your Honor.

2          THE COURT:  All right.  The Court will issue

3  an order.

4          The parties are excused.

5          The Court will stand in recess.

6          ------------------------------------
                    Time:  1:10 p.m.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21       I certify that the foregoing is a true and

22  accurate transcription of my stenographic notes.

23

24
                              _____
                                       /s/
25                            Rhonda F. Montgomery, CCR, RPR